GEORGE BROTHERS & CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 93248.   Promulgated February 7, 1940.

*I. M. Peckham, Esq.,* for the petitioner.
*T. M. Mather, Esq.,* for the respondent.

# 288

DISNEY: This proceeding involves income and excess profits taxes as follows:

| Year | Income | Excess Profits |
|---|---|---|
| 1934 | $1, 010. 59 | $367. 49 |
| 1935 | 2, 682. 55 | 975. 47 |

The questions presented are, whether the Board has jurisdiction, whether petitioner is an association taxable as a corporation, whether it is entitled to deduction for compensation for services rendered by its members, and whether it is subject to excess profits tax.

The petitioner, an organization of Chinese people, engaged for profit in the business of manufacturing overalls and work clothing, in San Francisco, California. The Chinese name of the organization is Dor Lee. It was first organized some time between 1880 and 1900. In January 1914 a "Partnership Agreement", as it was captioned, was prepared and signed by the then members of the organization. The instrument begins with the words, "THIS AGREEMENT OF COPARTNERSHIP", and recites, that the parties agree to associate together "as copartners" for the purpose of manufacturing working clothing, etc.; that profits and losses shall be taken by each in proportion to his interest; that the parties have delivered as capital $26,100 to be used in common in the business; that the style and title "of said copartnership shall be DOR LEE"; that 10 percent of the profits shall each year be awarded as bonus to the "partners" actively managing the business; that there shall be distributed to the "copartners each year" 6 percent interest on the paid-in capital, with provision for limitation or deferment thereof in case of shortage of cash; that the partners actively engaged in the management of the business shall receive monthly salaries, with no advance thereon of more than $20; that in case of embezzlement or misappropriation by the manager, his share or interest shall be forefeited to cover the loss, and he shall make further restitution until the loss is returned; that "the appointment in the personnel for the operation of said business shall be entrusted to the manager, the cashier and the sales manager; the silent partners shall have no voice in the matter"; that the manager shall make an annual report and account on the business for the inspection of the partners; that no manager, cashier, or sales manager shall leave the service of the copartnership suddenly and without giving notice, and shall remain for six months to give assistance to his successor; that a partner wishing to withdraw shall give six months notice, shall

be entitled to no account or inventory of the business, but shall wait until the end of the year, when the value of his interest in the co-partnership shall be determined; that if the copartnership takes over his interest, he shall be paid 90 percent of the value as determined by inventory and accounting at the end of the year, and may transfer his interest to an outsider only when neither the copartnership nor any of the copartners desires to acquire it, and then only upon the consent of the other parties; that the manager shall be appointed by the copartners, and may for dereliction in duties be removed by the action of the copartners in meeting assembled; that during the last month of each calendar year the manager shall give formal notice to those active partners whose services he desires to retain for the ensuing year, and any active partner failing to receive such notice may not draw further compensation for services. Attached to the agreement is a list of the copartners and the interest, in dollars, of each, with notations showing three transfers, apparently all in 1926, with amounts transferred. Between 1914 and 1935 there were 21 withdrawals, partial withdrawals, changes and partial changes, of interest. There were changes of managers. There was no change in membership in 1934 or 1935. Throughout those years there were 15 members, of whom 9 lived in China and 6 in San Francisco. Five, including a manager, worked actively in the business. The manager took care of the finances, wrote checks, and supervised the keeping of the books, and was consulted by the others; another took care of accounts, bought goods, and supervised the office employees, his duties being roughly that of office manager; another was an inside salesman; another was a general salesman; another was foreman of the factory where the women worked. Federal income tax returns for 1934 and 1935 were filed on the partnership form, in which no salaries or compensation of partners was included. The reasonable compensation of the manager, Dong Hin, was $350 per month and of the office manager, Lai Shun, the general salesman, Chan Sing, and the foreman, Chan Son, each $200 per month, and of Chan Tim, the inside salesman, $125 per month. All policies of the organization were decided by calling together all the partners resident in San Francisco. The members in China were not consulted about management; they trusted the active partners to handle the business properly. The organization, in purchasing on credit, always represented itself to be a partnership.

Petitioner carried a loan account with Wells Fargo Bank, which from time to time took signature cards and statements as to the nature of the organization, and it was invariably described as a partnership. The bank had a corporation form, but petitioner filled the statement on the partnership form. The bank had no form for a voluntary associa-

tion or joint stock company. Credit was extended by the bank to petitioner as a partnership. They represented to the bank that they were partners. J. L. Bailey & Co. and the Universal Button Co. have sold cotton goods to petitioner since 1919 on credit, on the representation of petitioner that it was a partnership. It had for the past ten years been rated by Dun & Bradstreet, Inc., and other credit agencies as a partnership. Partners and general partners are mentioned in a report of Dun & Bradstreet, Inc., of May 8, 1934; a report of the same agency November 1, 1933, refers to three active partners and about twenty general partners, one-half of them living in China. Petitioner was described as a partnership in its application for casualty and compensation insurance and in the policies. It has from time to time received from the Commissioner extensions of time for filing partnership returns.

In 1928 the petitioner published duly acknowledged notice of a "Certificate of Copartnership Doing Business Under a Fictitious Name", and on November 15, 1928, filed same in the office of the clerk of the Superior Court of the City and County of San Francisco. The certificate was signed by Lai Shun, Dong Hin, Chan Chew, Chan Son, Chan Loy, and Lai Ting, who were resident in San Francisco, and recites that they are "all of the members of said copartnership." Two others, resident in San Francisco, Loo Yee Toe and Loo Yee Koung did not sign. All the signers were employed in the organization. The Federal income tax returns for 1934 and 1935 each recites the nature of the organization as partnership and recites distribution of profits to 13 partners (also "Estate of Lai Chow, China," and "Chan Loy Estate", address San Francisco), of whom 9 are shown as in China. The returns were filed on the accrual basis and on a calendar year basis. The net worth of petitioner was, on December 31, 1933, $128,890.86, and on January 1, 1935, $137,107.04—not including good will. The members in 1934 and 1935 were the same who signed the agreement in 1914, except that a father in 1928 transferred a $500 interest to each of two sons; and another father transferred to his son two-fifths of his interest; and the son was admitted by consent of the other members. There had been withdrawals. One member, Loo Sing Won, died and his interest, under the Chinese law and custom, passed to his widow, and when she died, it passed to her two sons. Four members withdrew. One had an interest under two different names and withdrew the interest held under one name, retaining the other. The rest of the 21 changes were withdrawals.

The individual members repeatedly rendered their income tax returns disclosing their receipts from the petitioner, and no complaints were made by the collector's office. There were no units in the organization, and no documents evidencing ownership except what was called the "partnership book" containing entries. The members resi-

dent in China receive 6 percent on their investment. All profit is divided.

The petitioner first challenges the jurisdiction of the Board. The question was raised in the petition and by motion to strike that portion of the petition. In opposition to the motion petitioner filed a brief extensively arguing the jurisdictional question. The motion to strike was sustained. We therefore consider the question as already passed upon. However, we believe and hold that we have jurisdiction, under *Continental Products Co.* v. *Commissioner*, 66 Fed. (2d) 434, and *Thalhimer et al.* v. *Commissioner*, 62 Fed. (2d) 703.

Is petitioner a partnership or an association taxable as a corporation, within the intendment of the Revenue Act of 1934? Petitioner contends that it is a general partnership. Respondent raises no contention that it is a special limited partnership and there was no compliance with the prerequisites necessary to such partnership. We have, therefore, to decide between general partnership and association taxable as a corporation. The question is not one controlled by local law. *Wholesalers Adjustment Co.* v. *Commissioner*, 88 Fed. (2d) 156.

As stated in Regulations 86, article 801–4: "The Act provides its own concept of a partnership." The definition is:

SEC. 801. DEFINITIONS.

   (a) When used in this Act [1934]—

   \*       \*       \*       \*       \*       \*       \*

   (3) The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this Act, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

The expression "association" is likewise a broad one, as used in the Regulations.[1] No single characteristic of the organization examined or element has been presented as determinative, though stress, in various cases, has been laid upon different aspects of the situation. In *Wholesalers Adjustment Co.* v. *Commissioner, supra*, and in *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369, weight has been given to the purpose, as found in the agreement of the parties. Here we have

---

[1] ART. 801–2. *Association.*—The term "association" is not used in the Act in any narrow or technical sense. It includes any organization, created for the transaction of designated affairs, or the attainment of some object, which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which, like corporate affairs, are conducted by a single individual, a committee, a board, or some other group, acting in a representative capacity. It is immaterial whether such organization is created by an agreement, a declaration of trust, a statute, or otherwise. It includes a voluntary association, a joint-stock association or company, a "business" trust, a "Massachusetts" trust, a "common law" trust, an "investment" trust (whether of the fixed or the management type), an interinsurance exchange operating through an attorney in fact, a partnership association, and any other type of organization (by whatever name known) which is not, within the meaning of the Act, a trust or an estate, or a partnership. If the conduct of the affairs of a corporation continues after the expiration of its charter, or the termination of its existence, it becomes an association.

a written agreement. Examination is, of course, to be made of all other facts, and each case rests primarily upon the facts presented. The question herein presented is not an easy one. The organization presents some aspects tending under some of the decisions to indicate partnership, others to indicate an association. Upon review of all of the evidence, however, we think it inclines strongly towards establishment of partnership. There were articles of copartnership, not essentially different from those usual with partnerships; and the term "partner" is repeatedly used. Of course the designation is not conclusive; yet we think it is not without bearing.

As in *Helvering* v. *Coleman-Gilbert Associates*, *supra*, the parties were not considered free to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted, so here their formal articles of agreement, executed in 1914, must be given consideration. The same appears logically true of the fact that credit for a number of years had been extended to the corporation as a partnership, and upon representations by the members that it was such, and that the same representation had been made in obtaining casualty and industrial insurance.

A formal certificate of doing business as a partnership under a fictitious name, and the publication of notice thereof, in 1928, six or seven years prior to the taxable years, is strong indication, we think, of the true character of the group. It is true that only six members signed, and that they represented themselves in the certificate to be all of the partners, and this, unexplained, indicates deception in that regard. Yet it does not, we think, indicate that others were not members; but only that from inconvenience or otherwise, the others did not sign. The certificate does show that the intent was to carry on as partners, and the names of other members are furnished by the articles and records of the organization.

The agreement by its terms negatives the idea of free assignability of interests, often cited as an indication of an association, for it provides for transfer to one outside the organization only when neither the organization nor the other members desire to acquire, and then only by consent of the other members. There were no certificates of interest as in case of a corporate organization, the only record of a member's interest appearing in a book in a Chinese dialect. From 1914 to 1935, inclusive, there had been only one transfer of an interest to an outsider, and that with the consent of the other members. There had been withdrawals, and transfers between members, and in two cases there was distribution of profits to the estates of deceased members in 1934. Withdrawals, of course, are not unusual in partnerships, nor is it unusual for the heirs or estates of deceased persons to be permitted to share. The terms of the agreement are plain that this can be only by agreement, and by such agreement, of course, any sort of change as to

members or other matters can be made in a partnership; since that relationship depends upon agreement. It is apparent from the articles that without agreement for the admission of the heirs or estate of a deceased person, none such could enter the group. This is, of course, the negation of continuity regardless of death of members.

Respondent urges that there was centralized management and quotes *Morrissey* v. *Commissioner*, 296 U. S. 344. There was centralized management in a sense, yet we think it bears more resemblance to that of a partnership with a manager and assistants than that of a corporation. A partnership not infrequently has a manager. Petitioner had no president, secretary, or board of directors, or board of control at all similar to that of a corporation. The authority of the manager, moreover, was limited. He is given power with the cashier and sales manager to appoint the personnel necessary for the operation of the business; and the silent members had no voice in the matter. Apparently the silent members had a voice in everything else. All had agreed to "associate themselves as copartners for the purpose of manufacturing  *  *  *  to the faithful performance of which they mutually bind and engage themselves." There was from profits a 10 percent "bonus to the partners actively managing said business", and compensation was paid monthly "to the partners actively engaged in the management of said business"; so that it is apparent that they were actually engaged as *partners*, rather than in a position similar to that of corporate officers. The manager himself was "appointed by the copartners" and was removable by them, "in meeting assembled", for dereliction in duties. He made an annual account and report on the business "for the inspection of the partners." The residuum of power was obviously with the members. We think that the organization in this respect is that of active and silent partners, a usual arrangement, rather than of a corporate character.

Nothing appears to limit the liability of the members, except that each took profits and losses in proportion to his interest. Though this does not definitely state that the provision is as between the members only, it is an agreement among themselves, without other effect. There is no provision, as in the case of an ordinary corporation, limiting liability to the amount of investment. The provision is rather that of whatever liability or gain there may be, each will, as to the others, contribute in proportion, without regard to the amount he has invested. We think there is not here the similarity to the corporate set up which would indicate an association taxable as a corporation.

It is also urged that the members each received only 6 percent, similar to a corporate dividend; and that the corporate capital was the original contribution of $26,100. But the evidence indicates otherwise. Though there is provision for distribution of 6 percent

each year, and it is referred to as "interest", yet "in the event of shortage of cash the distribution of said interest may be limited or deferred", and that the share is not limited to 6 percent is shown by the provision that the "profits * * * of said business shall be taken by each partner proportionately as his interest bears to the total capital." Moreover, in 1934 and 1935, the amounts reported as distributed to partners do not represent 6 percent. Thus Lai Quon or Quong, one of the original signers, contributed $2,500 out of the $26,100. His distribution in 1934 was $816.64, in 1935, $2,167.76; while Dong Hin, originally contributing $1,000, received distribution in 1934 of $612.48 and in 1935 of $1,625.74. Whatever profit was made was either divided or credited to the "partners" on the books. We think there is little similarity to shares of stock held. There was no unit, such as $100. In two instances a $250 interest was transferred.

After a study of this interesting Chinese organization in the light of the leading cases on this subject, which it is unnecessary to enumerate further, we are convinced that it is not essentially different from an ordinary partnership having inactive or silent partners. The definition of "partnership" by section 801 (a) (3) of the Revenue Act of 1934 is obviously so broad as to cover it. It is not a trust, an estate, or a corporation. We, therefore, conclude and hold that it was not an association taxable as a corporation.

In the light of such conclusion it is unnecessary to decide the remaining questions as to excess profits tax and deductions for compensation to members.

*Decision will be entered for the petitioner.*